## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Case No. 20-12969 (JTD) |
| MEDIA LODGE, INC., | Chapter 11 |
| Debtor. | |
| MEDIA LODGE, INC., | |
| Plaintiff, | Adv. Proc. No: 21-50246 (JTD) |
| vs. | |
| GUNUP HOLDING, INC. D/B/A GUNUP, INC., | |
| Defendant. | |
| GUNUP HOLDING INC. D/B/A GUNUP, INC., | |
| Counterclaim Plaintiff, | |
| vs. | |
| MEDIA LODGE, INC., | |
| Counterclaim Defendant. | |
| GUNUP HOLDING INC. D/B/A GUNUP, INC., | |
| Third-Party Plaintiff, | |
| vs. | |
| GEMINI DIRECT, LLC | |
| Third-Party Defendant. | |

## FIRST AMENDED ANSWER, COUNTERCLAIM, AND THIRD-PARTY CLAIMS

Defendant GunUp Holding Inc. d/b/a GunUp, Inc. ("GunUp") hereby answers the Second Amended Adversary Complaint of Plaintiff Media Lodge, Inc. ("Media Lodge"), and asserts counterclaims and third-party claims pursuant to 11 U.S.C. §§ 105(a), 510(c), 523(a), and 1192 against Media Lodge, Inc. and Gemini Direct, LLC.

## ANSWER

### JURISDICTION AND VENUE

1.      GunUp admits that this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and that this proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (K).  GunUp consents to the entry of a final order by the Court.

2.      Admitted.

### PARTIES

3.      Admitted.

4.      Admitted.

### BACKGROUND

5.      Admitted.

6.      GunUp admits that Media Lodge was created in 2014 to manage the sale of advertising on GunBroker.com.  GunUp denies that Media Lodge and GunBroker.com are sister companies.  GunUp is without knowledge or information sufficient to know the accuracy of the allegation that GunBroker.com is owned by IA Tech, and therefore denies the same. GunUp admits that before the merger with Defendant, IA Tech was also Media Lodge's sole owner.  GunUp admits the allegations in the third and fourth sentences of paragraph 6.  GunUp denies the remaining allegations of this paragraph.

7.      Admitted.

8.      GunUp admits that in late 2014, Media Lodge sought to expand advertising beyond GunBroker.com, and entered into discussions with GunUp about acquiring GunUp's wholly owned subsidiary, GunUp Publishing, Inc.  GunUp admits the allegations in the second sentence of paragraph 8.  GunUp denies the remaining allegations of this paragraph.

9.      GunUp admits that the merger of GunUp Publishing, Inc. into Media Lodge (the "Transaction") closed on or about March 31, 2015, pursuant to the Merger Agreement to which GunUp was a party.  A true and correct copy of the Merger Agreement is attached hereto as Exhibit A.  GunUp states that the Merger Agreement is a document that speaks for itself, and GunUp therefore denies the allegations of paragraph 9 to the extent they paraphrase or characterize the Merger Agreement in a manner inconsistent with its terms or substance. GunUp denies the remaining allegations of this paragraph.

10.      The allegations in the first two sentences of paragraph 10 pertain to specific terms of the Merger Agreement.  GunUp states that the Merger Agreement is a document that speaks for itself, and GunUp therefore denies the allegations of paragraph 10 to the extent they paraphrase or characterize the Merger Agreement in a manner inconsistent with its terms or substance.  GunUp admits that under the Merger Agreement, GunUp was to have received, in exchange for its performance, consideration represented by Media Lodge and its representatives to have been worth $4,000,000 based on a $38.25 million valuation of Media Lodge.  GunUp admits the allegations in the final sentence of paragraph 10.  GunUp denies the remaining allegations of this paragraph.

11.      GunUp admits the allegations in the first sentence of paragraph 11.  The allegations in the second sentence of paragraph 11 pertain to specific terms of the Merger

Agreement.  GunUp states that the Merger Agreement is a document that speaks for itself, and GunUp therefore denies the allegations of paragraph 11 to the extent they paraphrase or characterize the Merger Agreement in a manner inconsistent with its terms or substance. GunUp admits the allegations in the final sentence of paragraph 11.  GunUp denies the remaining allegations of this paragraph.

12.     GunUp admits that Media Lodge did not make the May 15, 2016 payment or any of the remaining transfers of cash or common stock due to GunUp under the Merger Agreement.  GunUp denies the remaining allegations of this paragraph.

13.     GunUp admits that it filed suit against Media Lodge in the Washington Action on June 23, 2016, and that a true and correct copy of the GunUp Complaint is attached to Media Lodge's Second Amended Adversary Complaint as Exhibit B.  GunUp states that the GunUp Complaint is a document that speaks for itself, and GunUp therefore denies the allegations of paragraph 13 to the extent they paraphrase or characterize the GunUp Complaint in a manner inconsistent with its terms or substance.  GunUp denies the remaining allegations of this paragraph.

14.     GunUp admits that it filed a first amended complaint in the Washington Action (the "Washington FAC") on October 23, 2017, adding claims under the Washington State Securities Act ("WSSA") against Media Lodge, IA Tech, Susan Lokey, and then-directors Jeff Siegel, Steve Urvan and Kevin O'Connell.  GunUp states that the Washington FAC is a document that speaks for itself, and GunUp therefore denies the allegations of paragraph 14 to the extent they paraphrase or characterize the Washington FAC in a manner inconsistent with its terms or substance.  GunUp denies the remaining allegations of this paragraph.

15.     Admitted.

16.      Admitted.

17.      GunUp admits that it requested a judgment that Media Lodge and Mr. Siegel had violated the WSSA.  GunUp denies that it sought rescission of the Merger Agreement. Rather, GunUp requested rescissory damages—that is, the value of the consideration it gave for the cash and shares it received and was to have received from Media Lodge.  GunUp denies the remaining allegations of this paragraph.

18.      Admitted.

19.      Admitted.

20.      Admitted.

21.      Admitted.

22.      Admitted.

23.      Admitted.

24.      Admitted.

25.      Denied.  The Judgment represents the value of the consideration given by GunUp in connection with the Merger Agreement—that is, the value of GunUp as of the date of the Transaction.

26.      Admitted.

27.      Admitted.

28.      Admitted.

29.      Admitted.

## COUNT I—SUBORDINATION OF CLAIM

30.      GunUp restates and incorporates by reference its responses to the allegations in paragraphs 1–29 of Media Lodge's Second Amended Adversary Complaint.

31.     Denied.

32.     Admitted.

33.     GunUp admits that the essential nature of the Merger Agreement was that GunUp provided consideration (including its shares of stock in GunUp Publishing, Inc.) in exchange for cash and shares of Media Lodge common stock.  GunUp denies the remaining allegations of this paragraph.

34.     Admitted.

35.     Admitted.

36.     GunUp admits that the Judgment (which speaks for itself) forms the basis of the GunUp Claim.  GunUp denies the remaining allegations of this paragraph.

37.     GunUp admits that the Judgment relates to shares of stock that Media Lodge conveyed and was to have conveyed to GunUp, and to Media Lodge's material misrepresentations and omissions in connection with the Merger Agreement and the Transaction.  GunUp admits that the Judgment and the GunUp Claim arise from the purchase or sale of a security.  GunUp denies the remaining allegations of this paragraph.

38.     GunUp admits that Media Lodge accurately quotes 11 U.S.C. § 510(b), but denies that under this statute the GunUp Claim should be subordinated to any interest in or claim against Media Lodge held by Gemini Direct, LLC or Gemini Direct Investments, LLC.

The complaint's WHEREFORE clause purports to be a summary of the relief sought by Media Lodge to which no response is required.  To the extent a response shall be deemed required, GunUp denies that Media Lodge is entitled to any of the relief Media Lodge seeks.

## COUNTERCLAIM AND THIRD-PARTY CLAIMS

## NATURE OF THE ACTION

1.      Pursuant to 11 U.S.C. §§ 105(a), 510(c), 523(a) and 1192, Defendant and creditor GunUp hereby asserts a counterclaim against Plaintiff and debtor Media Lodge and third-party claims against Gemini Direct, LLC ("Gemini").

2.      GunUp seeks a declaration that the GunUp Claim is nondischargeable pursuant to 11 U.S.C. §§ 1192 and 523(a)(19) because it is a debt originating from a judgment against Media Lodge for violation of a state securities law, namely the Washington State Securities Act, RCW 21.20.010(2), and RCW 21.20.430(1), (3).  (Dkt. No. 1, Adversary Complaint ["Complaint"], ¶¶ 18–20.)

3.      GunUp also seeks an order recharacterizing advances made by IA Tech, LLC ("IA Tech") and Gemini Direct Investments, LLC ("GDI") to Media Lodge (the "GDI Claim") as capital contributions pursuant to 11 U.S.C § 105(a) and the doctrine articulated in *In re SubMicron Sys. Corp.*, 432 F.3d 448 (3d Cir. 2006), *In re Our Alchemy, LLC*, No. 16-11596 (KG), 2019 Bankr. LEXIS 2904 (Bankr. D. Del. Sep. 16, 2019), and related cases.

4.      In addition, or in the alternative to the extent required under law, GunUp seeks an order subordinating any claim or interest held by GDI or Gemini to the GunUp Claim on equitable grounds, pursuant to 11 U.S.C. §§ 105(a) and 510(c).

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over GunUp's counterclaim and third-party claims pursuant to 28 U.S.C. § 1334.  This proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (K).  Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware,

GunUp consents to the entry of a final order by the Court in connection with its counterclaim and third-party claims to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6.      GunUp's counterclaim against Media Lodge is proper pursuant to Bankruptcy Rule 7013, as it arises out of the same transaction that is the subject of Media Lodge's claim and does not require adding any party over whom the Court lacks jurisdiction.

7.      GunUp's third-party claims against Gemini are proper pursuant to Bankruptcy Rules 7014, 7018 and 7019, as resolution of these third-party claims is necessary for the Court to accord complete relief among the existing parties, GunUp and Media Lodge.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

9.      GunUp is a Delaware corporation with its principal place of business in the State of Washington.

10.      Media Lodge is a Delaware corporation with its principal place of business in the State of Georgia and is the debtor-in-possession in the underlying proceeding under Chapter 11 of Title 11 of the United States Code.

11.      Gemini is a Nevada limited liability company.  On information and belief, Gemini's principal place of business is in the State of Nevada.  On information and belief, Gemini is owned by Steve Urvan.  On information and belief, Gemini became Media Lodge's ultimate parent in April or May 2021.  Previously, GDI was Media Lodge's ultimate parent. On information and belief, GDI has transferred or assigned all its assets and interests to Gemini, including any interest or claim that GDI may hold in or against Media Lodge in the

underlying bankruptcy matter, and GDI's ownership of TVP Investments, LLC ("TVP"), Media Lodge's direct parent.

## FACTUAL BACKGROUND

**A.      THE TRANSACTION**

12.      Prior to the merger transaction that is at the heart of this matter (the "Transaction"), GunUp was a company primarily engaged in the sale of online advertising related to firearms and outdoor lifestyles.  GunUp's advertising business was operated through a subsidiary, GunUp Publishing, LLC ("GP LLC").

13.      In November 2014, Jeff Siegel, then serving as CEO of Media Lodge, LLC ("ML LLC"), contacted Daniel Hall, GunUp's CEO, via LinkedIn.  In his message, Mr. Siegel expressed a desire to do business together, and the parties began negotiations toward that end.

14.      During the course of these negotiations, it was determined that the Transaction would be in the form of a "tri-party merger."  To accomplish the merger, GP LLC would be converted to GunUp Publishing, Inc. ("GunUp Publishing"), a Delaware corporation, ML LLC would be converted to Media Lodge, and Media Lodge would then purchase GunUp Publishing pursuant to a merger agreement between Media Lodge, MLA Acquisition Corp., GunUp Publishing, and GunUp (the "Merger Agreement").  (*See* Exhibit A.)

15.      The merger of GunUp Publishing into Media Lodge closed on or about March 31, 2015.  Under the Merger Agreement, GunUp was to receive, as consideration for the sale of GunUp Publishing and the winding-up of GunUp's other subsidiary, cash in the amount of $1,000,000 and shares of stock in Media Lodge that, according to Media Lodge and its representatives, were worth $3,000,000.  (Complaint, ¶¶ 9–11.)

16.     Unbeknownst to GunUp, during negotiations leading up to the Transaction, Media Lodge and its agents made numerous material misrepresentations regarding the company's valuation, profitability, and relationships with its affiliated entities.  For example:

a.      Although Mr. Siegel told Mr. Hall that ML LLC had the exclusive right to represent affiliated entity GunBroker.com "in perpetuity," Media Lodge did not disclose that it only had an oral agreement with GunBroker that GunBroker could cancel at any time.

b.      Media Lodge did not disclose that all advertising revenue earned by ML LLC in 2014 had been deposited into GunBroker's bank account, or that before the Transaction closed GunBroker had not transferred any of these payments into Media Lodge's bank account.

c.      Media Lodge did not disclose that except for $25 required to open Media Lodge's only bank account, every deposit into the account prior to closing of the Transaction had been a loan from an affiliated entity to fund operational shortfalls at Media Lodge.

d.      In response to a request by GunUp for "Media Lodge's 2014 financials," ML LLC passed off as "the Media Lodge 2014 P&L" an incomplete "interim" profit and loss statement that omitted approximately $1 million in costs.

e.      Media Lodge included in the Merger Agreement a provision falsely indicating that it had minimal liabilities and infrequent shortfalls in capital.

f.      Media Lodge did not disclose that all of its intellectual property (even its brand name and the medialodge.com domain) was owned by an affiliated entity and was licensed to Media Lodge pursuant to an agreement (executed by ML LLC board

member Steve Urvan on behalf of affiliate S&T Tech, LLC and ML LLC) that was cancelable at any time.

17.     Additionally, Media Lodge did not disclose that it was completely dependent upon its parent company, IA Tech, for operating capital.  IA Tech had advanced Media Lodge $770,517.75 as of December 31, 2014, and $1,330,557 as of March 31, 2015, when the Merger Agreement was signed.  And Media Lodge did not disclose that those advances were made pursuant to a March 31, 2015 promissory note (executed by Mr. Urvan on behalf of IA Tech and Mr. Siegel on behalf of ML LLC) that allowed IA Tech to demand repayment whenever it wished.

18.     Media Lodge made $500,000 in cash payments to GunUp pursuant to the Merger Agreement and transferred some Media Lodge stock to GunUp, but did not pay the remainder of the cash it owed to GunUp and did not complete the stock transfers contemplated by the Merger Agreement.

**B.     GDI, MEDIA LODGE, AND THE GUNBROKER.COM COMPANIES**

19.     Until recently, Media Lodge was part of a group of companies associated with the GunBroker.com website.  At the time of the Transaction, Media Lodge and GunBroker.com, LLC ("GunBroker") were subsidiaries of IA Tech.  Media Lodge, GunBroker, GDI, IA Tech, and TVP—IA Tech's successor-in-interest and, on information and belief, still Media Lodge's direct parent—were at all times relevant part of the GunBroker family of companies, then ultimately owned and controlled by Mr. Urvan.  Media Lodge was owned by IA Tech until 2019, at which time TVP took ownership of Media Lodge and became IA Tech's successor-in-interest. These companies and others in the GunBroker family shared executive

personnel, officers, and directors, including Mr. Siegel, Mr. Urvan, Kevin O'Connell and Susan Lokey.

20.    On information and belief, on or about May 3, 2021, Mr. Urvan sold GDI to Speedlight Group I, LLC ("Speedlight"), a subsidiary of AMMO Munitions, Inc. ("AMMO"), via the merger of GDI into SpeedLight.[1]  At the time of that transaction, GunBroker was owned by IA Tech, which was owned by GB Investments, Inc., which was owned by GDI, which was owned by Mr. Urvan.  (Bankr. Dkt. No. 65, ¶ 2.)  On information and belief, AMMO is now GunBroker's ultimate parent.  Per the debtor's filings with this Court, until recently TVP was owned by GDI, which, again, was owned by Mr. Urvan.  (Bankr. Dkt. No. 47, Ex. A.)  On information and belief, GDI's interests in TVP and Media Lodge were carved out of the AMMO transaction and transferred to Gemini.

21.    Media Lodge (which, prior to the Transaction, operated as ML LLC) was established in 2014 for the express purpose of managing the sale of advertising on GunBroker.com.  Advertisers paid to place advertisements on the website, and the resulting revenue was split between Media Lodge and GunBroker pursuant to a revenue-sharing agreement.  In addition to the revenue share, Media Lodge owed its then-parent company, IA Tech, a management fee.  (Bankr. Dkt. No. 13, ¶¶ 12–13, 15.)

22.    Media Lodge has earned significant revenue from 2014 to the present by brokering the placement of advertisements on GunBroker.com and other websites.  According to documents that Media Lodge produced in discovery in *GunUp, Inc. v. Media Lodge, Inc.*, King County Superior Court Cause No. 16-2-15005-5 SEA (the "Washington Action"), Media Lodge earned gross revenue of $1,882,674.44 in 2014, $3,072,230.73 in 2015, $4,356,947.98

---

[1] *See* Part E, below.

in 2016, and $6,161,718.82 in 2017.  Media Lodge reported in its Form 207, submitted in the underlying bankruptcy matter, that it earned gross revenue of $4,770,404 in 2018, $5,469,062 in 2019, and $2,523,235.00 during the first ten months of 2020.

23.    A significant percentage of these amounts was retained by or paid to GunBroker pursuant to the alleged revenue-sharing agreement, and IA Tech received a management fee through at least 2017.  According to Media Lodge's records produced in the Washington Lawsuit and its filings in the underlying bankruptcy proceeding, Media Lodge's revenues retained by or paid to GunBroker and IA Tech totaled at least $1,276,108.00 in 2014, $1,602,428.83 in 2015, $1,683,692.02 in 2016, $2,611,539.23 in 2017, $926,768.00 in 2018, $1,815,785.00 in 2019, and $6,916.00 through the first ten months of 2020.  On information and belief, Media Lodge's revenue and revenue-share numbers declined in 2020 because starting that year Media Lodge began booking at least some of its revenue and GunBroker's share of that revenue at the level of Media Lodge's wholly owned subsidiary, Media Lodge LLC.  According to Media Lodge's records, the amount of Media Lodge revenue that GunBroker and IA Tech received from 2014 through 2019 was $9,916,321.08.  Assuming GunBroker received a revenue share in 2020 comparable to the share it received in prior years, the total number should be well in excess of $11.5 million.

24.    Media Lodge's revenue sharing agreement with GunBroker and the management fees it owed to IA Tech left it chronically undercapitalized and short of operating funds.  Indeed, from its inception, once the amounts that Media Lodge owed to its affiliates were siphoned off, Media Lodge was unable to generate enough revenue to sustain its operations and was insolvent.  In essence, Media Lodge was set up to lose money while funneling its revenues to GunBroker and IA Tech—and ultimately to Mr. Urvan.  Media Lodge

has been able to remain in business only because IA Tech and GDI provided it with operating

capital under cover of an essentially fictitious debt instrument, which enabled GDI to maintain

Media Lodge's supposed debt as an asset on its books.  Media Lodge claims that at the time of

its bankruptcy petition, IA Tech and GDI had advanced Media Lodge a total of $9,382,132 (the

"GDI Claim").[2]  The GDI Claim represents the sum of these purported advances, the interest in

which was assigned to GDI pre-petition and, on information and belief, was assigned to Gemini

post-petition.

      25.      Media Lodge further claims that the terms of IA Tech's and GDI's purported

advances to Media Lodge are memorialized in a "Secured Promissory Note" dated March 31,

2015 (the "Note").  A true and correct copy of the Note is attached hereto as Exhibit B.  GDI

has admitted that its predecessor-in-interest under the note, IA Tech, failed to perfect its

security interest, and GDI has conceded that the indebtedness is unsecured.  (*See* Bankr. Dkt.

No. 61 at p. 5, n.2.)

      26.      The Note includes a promise by Media Lodge to pay IA Tech "the aggregate

unpaid principal amount of all advances made by [IA Tech] hereunder … up to a maximum

principal amount of two million dollars ($2,000,000)," as well as interest on this unpaid

principal amount.  (Ex. B, p. 1.)  The Note does not reflect any promise by Media Lodge to

repay to IA Tech (or GDI) any principal amount in excess of $2,000,000.  There is no evidence

that the Note or any other written loan agreement governs the additional $7+ million

comprising the GDI Claim.

---

[2] GDI is not listed as a creditor in Media Lodge's underlying bankruptcy proceeding and did not file a proof of claim.  Nevertheless, Media Lodge's Second Amended Plan of Reorganization lists the indebtedness to GDI as a liability and provides for repayment of the GDI Claim as part of Class 2.

27.     Neither the Note nor any other agreement governing the GDI Claim contains any fixed maturity date or any schedule for repayment of principal.  Moreover, although the Note states an interest rate, neither the Note nor any other agreement governing the GDI claim establishes a schedule for repayment of interest.  Instead, the Note is payable "on demand."

28.     Given the amount of revenue that Media Lodge was earning, the percentage of the revenue that was due to GunBroker and IA Tech, and Media Lodge's resulting chronic undercapitalization, repayment of the funds transferred to it by IA Tech and GDI was entirely dependent on whether Media Lodge could ever generate a profit.  When IA Tech and GDI provided operating funds to their subsidiary entity, there was no viable repayment source and no certainty of repayment.  Indeed, there was no reasonable prospect that the funds provided to Media Lodge would ever be repaid.  The Note did not require Media Lodge to establish a sinking fund or other reserve account, and Media Lodge never established one.

29.     Although the Note gave IA Tech a security interest in Media Lodge's assets, this interest was illusory because Media Lodge's assets were immaterial.  Moreover, IA Tech never bothered to perfect its security interest in these assets, such as they were.  And Media Lodge did not give IA Tech or GDI any security interest in connection with the operating funds that IA Tech and GDI transferred to Media Lodge in excess of the amount set forth in the Note ($2 million plus interest).

30.     Although the Note was payable on demand, on information and belief, neither IA Tech nor GDI has ever called the Note or demanded that Media Lodge repay any portion (principal or interest) of the funds that IA Tech and GDI advanced to cover Media Lodge's operating costs and expenses (resulting in *de facto* subordination of the advances), and Media Lodge never made any such repayments.

31.     On information and belief, Media Lodge has never sought or had the ability to obtain financing for its business activities from any independent outside lending institution, whether on terms comparable to those reflected in the Note, or otherwise.

32.     On information and belief, Media Lodge has not paid dividends to IA Tech or TVP and has not generated or maintained corporate records or observed corporate formalities.

33.     There was an identity of interests between IA Tech and GDI on the one hand, and Media Lodge on the other, because IA Tech and TVP have always owned all of Media Lodge's shares except the small number of shares that GunUp received in connection with the Transaction.

## C.     THE WASHINGTON ACTION

34.     On June 23, 2016, GunUp sued Media Lodge in King County, Washington Superior Court, primarily alleging breach of contract.  On October 23, 2017, GunUp amended its complaint in the Washington Action to add claims under the Washington State Securities Act ("WSSA"), RCW ch. 21.20, against Media Lodge and several other defendants, including Mr. Siegel and Mr. Urvan.  A true and correct copy of GunUp's Second Amended Complaint in the Washington Action is attached hereto as Exhibit C.[3]

35.     The essence of GunUp's WSSA claim in the Washington Action, as developed by GunUp in discovery, was that Media Lodge had concealed the true nature of its situation within the GunBroker family of companies—namely that it was an empty shell with no real value or assets, deeply indebted to its parent and sister companies, and guaranteed to keep losing money under the undisclosed and arbitrary terms of its agreements with its affiliates.

---

[3] To avoid redundancy, the copy attached hereto omits the exhibits originally filed with the Second Amended Complaint—most significantly, the lengthy Merger Agreement.  The copy of the Merger Agreement that was filed with GunUp's Second Amended Complaint in the Washington Action is attached hereto as Exhibit A.  *See* Answer at ¶ 9, above.

36.     Based on the facts and information it developed in discovery in the Washington Action, GunUp sought summary judgment against Media Lodge and Mr. Siegel on its WSSA and breach-of-contract claims.  GunUp asserted that it was entitled to rescissory damages for Media Lodge's and Mr. Siegel's violations of the WSSA.  On October 28, 2018, the Washington trial court granted GunUp's motion for summary judgment and found that as a matter of law Media Lodge and Mr. Siegel had violated the WSSA, RCW 21.20.010(2), and RCW 21.20.430(1), (3), and breached the Merger Agreement.  (Complaint, ¶¶ 16–19, Ex. C.)

37.     Following a bench trial on the measure of GunUp's rescissory damages, on October 19, 2019, the Washington trial court issued a judgment in GunUp's favor in the amount of $1,245,444.93.  That amount represented the value of GunUp when the Transaction closed, less the $500,000 previously paid pursuant to the Merger Agreement, plus prejudgment interest.  On February 13, 2020, the Washington trial court's initial judgment was supplemented with an award of $1,232,545.84 in attorney's fees and costs, bringing the total amount of GunUp's judgment against Media Lodge and Mr. Siegel (the "Judgment") to $2,478,990.77.  (Complaint, ¶¶ 21–24, Exs. D, E.)

38.     Media Lodge and Mr. Siegel timely appealed the Judgment.  Their appeal is currently pending before Division One of the Washington Court of Appeals.  (Complaint, ¶¶ 26–27.)  Media Lodge and Mr. Siegel refused to pay the Judgment or to post a supersedeas bond or other form of security.

## D.     THE BANKRUPTCY PROCEEDING

39.     In early 2020, GunUp began post-judgment proceedings in the Washington Action, carrying out discovery against Media Lodge and Mr. Siegel prefatory to its efforts to collect on the Judgment.

40.     In post-judgment discovery, Media Lodge identified its bank accounts, accounts receivable, and other related information that allowed GunUp to initiate garnishment proceedings in Georgia.

41.     On November 10, 2020, shortly after GunUp obtained a writ of garnishment pertaining to Media Lodge's bank account, Media Lodge filed a bankruptcy petition in this Court under Chapter 11, Subchapter V of the Bankruptcy Code, 11 U.S.C. §§ 1181–1195. (Bankr. Dkt. No. 1.)  On November 12, 2020, Media Lodge amended its petition.  (Bankr. Dkt. No. 15.)

42.     On January 11, 2021, GunUp filed its Proof of Claim in the bankruptcy matter, arising from the Judgment in the Washington Action (the "GunUp Claim").  At the time of filing, GunUp valued the GunUp Claim at $2,637,883.59.  (Complaint, ¶¶ 28–29.)

43.     On February 8, 2021, Media Lodge filed its first Plan of Reorganization. (Bankr. Dkt. No. 97.)

44.     On March 15, 2021, Media Lodge filed a First Amended Plan of Reorganization contemporaneously with its filing of the Adversary Complaint in this matter.  (Bankr. Dkt. No. 107.)

45.     On March 18, 2021, Media Lodge filed a Second Amended Plan of Reorganization.  (Bankr. Dkt. No. 111.)

46.     On April 19, 2021, Media Lodge filed a Third Amended Plan of Reorganization (the "Plan").  (Bankr. Dkt. No. 137.)

47.     The Plan provides for the subordination and discharge of the GunUp Claim, as well as a release of all claims held by GunUp against Media Lodge and Mr. Siegel.  (*Id.* at pp. 4–5, 23–26.)

## E.      GUNBROKER SOLD

48.      In early 2021, GunUp learned that Mr. Urvan was attempting to sell GunBroker to an outside entity.

49.      SpeedLight was formed in Delaware on April 19, 2021.  On information and belief, SpeedLight was formed for the sole purpose of taking ownership of GDI, and via GDI, GunBroker.

50.      On or about May 3, 2021, AMMO issued a press release stating that it had acquired GunBroker.com.  As part of that transaction, Mr. Urvan became a member of AMMO's board of directors.

51.      GDI filed Articles of Merger with the Nevada Secretary of State on May 3, 2021.  The Articles of Merger indicate that GDI was merged into SpeedLight and apparently dissolved.

52.      As part of or as a consequence of that transaction, on information and belief, GunBroker was renamed Outdoors Online, LLC, and TVP was re-domiciled in Wyoming. Media Lodge has filed no paper updating or revising the corporate structure described in paragraphs 19 and 20 above.  On information and belief, GDI's interests in TVP and Media Lodge were not included in the AMMO transaction, but were instead transferred to Gemini.

**COUNT ONE**

**NONDISCHARGEABILITY PURSUANT TO
SECTIONS 1192 AND 532(a) OF THE BANKRUPTCY CODE
(against Media Lodge, Inc.)**

53.     GunUp re-alleges and incorporates by reference the allegations contained in
paragraphs 1–52 above.

54.     Media Lodge has filed a small-business bankruptcy petition pursuant to
Subchapter V of Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1181–1195.

55.     Under 11 U.S.C. § 1191(a), a plan of reorganization under Subchapter V may
only be approved if all the requirements of 11 U.S.C. § 1129(a), other than paragraph (15) of
that section, are met.

56.     Paragraph (8) of 11 U.S.C. § 1129(a) provides that a plan of reorganization may
only be approved where, "[w]ith respect to each class of claims or interests—(A) such class has
accepted the plan; or (B) such class is not impaired under the plan."

57.     The Plan provides for the GunUp Claim to be assigned to Class 3, and for
GunUp to receive no distribution.  (Bankr. Dkt. No. 110, pp. 1, 4, 20, 24.)

58.     GunUp is impaired under the Plan, and GunUp does not accept the Plan.  Thus,
the Plan cannot be approved under 11 U.S.C. § 1191(a) because, at a minimum, Media Lodge
cannot satisfy the requirements of 11 U.S.C. § 1129(a)(8).  Consequently, the Plan may only be
confirmed, if at all, under 11 U.S.C. § 1191(b), which provides that a plan of reorganization
may be approved if all the requirements of 11 U.S.C. § 1129(a), other than paragraphs (8), (10)
and (15) of that section, are met.

59.     11 U.S.C. § 1192 provides that "[i]f the plan of the debtor is confirmed under
section 1191(b) of this title . . . the court shall grant the debtor a discharge of all debts provided

in section 1141(d)(1)(A) of this title, and all other debts allowed under section 503 of this title and provided for in the plan, except any debt . . . (2) of the kind specified in section 523(a) of this title."

60.    11 U.S.C. § 523(a) provides in relevant part:

A discharge under section ... 1192 ... of this title does not discharge ... any debt—

(19) that

(A) is for—

(i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or

(ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

(B) results, before, on, or after the date on which the petition was filed, from—

(i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;

(ii) any settlement agreement entered into by the debtor; or

(iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

61.    Before Media Lodge filed its petition in this proceeding, it was found liable for violating the WSSA, a State securities law within the meaning of 11 U.S.C. § 523(a)(19)(A)(i), and GunUp obtained a judgment from a State court for damages based on that liability.

62.     The GunUp Claim accordingly falls within the scope of 11 U.S.C. § 523(a)(19). GunUp therefore seeks a declaration that the GunUp Claim is nondischargeable pursuant to 11 U.S.C. § 1192(2) and 11 U.S.C. § 523(a)(19), and that the GunUp Claim is exempted from any discharge provisions in the Plan or any subsequent or amended plan of reorganization.

## COUNT TWO

### RECHARACTERIZATION OF DEBT TO EQUITY PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE
### (against Gemini Direct, LLC)

63.     GunUp re-alleges and incorporates by reference the allegations contained in paragraphs 1–62 above.

64.     Pursuant to 11 U.S.C. § 105(a), this Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

65.     Bankruptcy Courts within the Third Circuit recognize that the equitable powers conveyed by 11 U.S.C. § 105(a) permit the recharacterization of debt to equity where the facts and circumstances indicate that the debt in question has the character of an insider capital contribution rather than a true debt.  *See, e.g., Our Alchemy*, 2019 Bankr. LEXIS 2904, at *17–*28; *In re HH Liquidation, LLC*, 590 B.R. 211, 292–97 (Bankr. D. Del. 2018).

66.     The millions of dollars that GDI and IA Tech claim to have advanced to Media Lodge have the character of insider capital contributions, not debt.  Among other things:

     a.     The alleged advances were made by Media Lodge's parent entities, which had an identity of interests with Media Lodge.

     b.     The alleged advances were largely (if not entirely) unsecured.

     c.     The alleged advances were not made pursuant to any agreement with a fixed maturity date or a schedule of repayment of principal or accrued interest.

d.      To the extent repayment was contemplated, it depended on the success of Media Lodge's business because Media Lodge had no material assets, and repayment was uncertain at best.

e.      Media Lodge was undercapitalized and insolvent from its inception.

f.      Media Lodge had no ability to obtain financing from outside lending institutions.

g.      The alleged advances were not made pursuant to any agreement requiring Media Lodge to establish a sinking fund or other reserve account for repayment, and Media Lodge never established any such fund or account.

67.     On information and belief, Gemini, as GDI's successor-in-interest, is the beneficiary or holder of the GDI Claim.

68.     Accordingly, GunUp seeks an order from the Court recharacterizing the GDI Claim as an equity interest and providing that any plan of reorganization confirmed by the Court shall treat the GDI Claim as such.

## COUNT THREE

**EQUITABLE SUBORDINATION PURSUANT TO SECTIONS 105(a) AND
510(c) OF THE BANKRUPTCY CODE
(as against Gemini Direct, LLC)**

69.     GunUp re-alleges and incorporates by reference the allegations contained in paragraphs 1–68 above.

70.     Pursuant to 11 U.S.C. § 105(a), this Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

71.     Likewise, 11. U.S.C. § 510(c)(1) provides that, after notice and a hearing, this Court may "under principles of equitable subordination, subordinate for purposes of

distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."

72.     GDI, through its wholly owned subsidiary TVP, was at all relevant times a "person in control of" Media Lodge, and therefore was an insider of Media Lodge within the meaning of 11 U.S.C. § 101(31)(B)(iii).  Indeed, at all relevant times, Media Lodge and GDI were controlled by the same individual, Mr. Urvan, who was the ultimate decision maker for both entities.

73.     Insider conduct is "rigorously scrutinized" for unfairness under Third Circuit jurisprudence.  *See Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 582 (Bankr. D. Del. 2012).

74.     On information and belief, Media Lodge is attempting to use the bankruptcy process to evade or otherwise escape judgment for Media Lodge's violation of the WSSA.

75.     On information and belief, Mr. Urvan and GDI planned Media Lodge's bankruptcy inequitably, so as to maximize GDI's recovery at GunUp's expense.  Gemini, as Media Lodge's ultimate parent and as an insider creditor, now stands to benefit directly and unfairly from Media Lodge's inequitable and evasive conduct—to the detriment of GunUp.

76.     Accordingly, in addition to the relief sought under Count Two, above, or in the alternative to the extent required by law, GunUp seeks an order from the Court equitably subordinating the GDI Claim—whether characterized as debt or equity—to the GunUp Claim.

**PRAYER FOR RELIEF**

WHEREFORE, GunUp Holding, Inc. respectfully requests that this Court issue an order

or orders declaring the GunUp Claim nondischargeable under 11 U.S.C. § 1192,

recharacterizing the GDI Claim as an equity interest pursuant to 11 U.S.C. 105(a), and

equitably subordinating any claim or interest held by Gemini Direct Investments, LLC, or its

successors or assigns, including Gemini Direct, LLC, to the GunUp Claim; and that the Court

grant such other and further relief as it may deem just and proper.


Dated: May 28, 2021              **KLEIN LLC**
       Wilmington, Delaware

                                 */s/ Julia B. Klein*
                                 Julia B. Klein (DE 5198)
                                 225 W. 14th Street, Suite 100
                                 Wilmington, Delaware 19801
                                 (302) 438-0456
                                 klein@kleinllc.com

                                 and

                                 Duncan E. Manville, WSBA #30304
                                 **SAVITT BRUCE & WILLEY LLP**
                                 1425 Fourth Avenue, Suite 800
                                 Seattle, Washington  98101-2272
                                 Tel.:   (206) 749-0500
                                 Fax:    (206) 749-0600
                                 Email: dmanville@sbwllp.com

                                 *Attorneys for GunUp Holding, Inc.*